1           IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    SECURITYPOINT HOLDINGS, INC.,        )

5              Plaintiff,                 ) Case No.

6                vs.                      ) 11-268C

7    THE UNITED STATES OF AMERICA,        )

8              Defendant.                 )

9

10

11

12                        Courtroom 9

13            Howard T. Markey National Courts Building

14                     717 Madison Place

15                      Washington, D.C.

16               Wednesday, November 1, 2017

17                       10:30 a.m.

18               Defendant's Motion to Compel

19

20

21           BEFORE:   THE HONORABLE ERIC G. BRUGGINK

22

23

24

25    Susanne Bergling, RMR-CRR-CLR, Digital Transcriber

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFF:
 3              BRADLEY C. GRAVELINE, ESQ.
 4              APRIL E. WEISBRUCH, ESQ.
 5              Sheppard Mullin Richter & Hampton, LLP
 6              70 West Madison, 48th Floor
 7              Chicago, Illinois  60602
 8              (312) 499-6300
 9              bgraveline@sheppardmullin.com
10    ON BEHALF OF THE DEFENDANT:
11              GARY L. HAUSKEN, ESQ.
12              ALICE S. JOU, ESQ.
13              LEE PERLA, ESQ.
14              U.S. Department of Justice - Civil Division
15              P.O. Box 480
16              Ben Franklin Station
17              Washington, D.C.  20044
18              (202)305-3075
19              gary.hausken@usdoj.gov
20    ALSO PRESENT:
21        Joel Lofgren, Esq., Department of Homeland Security
22        Mary Liddy, Esq., TSA
23        Marc Pilcher, Esq., TSA
24        Antonio DiNuzo, Sheppard Mullin
25
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1                P R O C E E D I N G S
 2                -   -   -   -   -
 3           (Proceedings called to order, 10:30 a.m.)
 4           THE COURT:  Okay, we're back.  You want to
 5     make your appearances?  For Plaintiff?
 6           MR. GRAVELINE:  Good morning, Your Honor, Brad
 7     Graveline for Plaintiff, SecurityPoint.  With me is
 8     April Weisbruch and Antonio DiNuzo (phonetic), who is
 9     one of our law clerks.
10           THE COURT:  All right, thank you.
11           For the Government?
12           MR. HAUSKEN:  Good morning, Your Honor.  Gary
13     Hausken for the United States.  With me are Alice Jou
14     and Lee Perla for the Department of Justice.  I also
15     have Mary Liddy at table -- counsel table with us with
16     the Department of -- the Transportation Security
17     Administration.  And in the two seats in the back are
18     Marc Pilcher of the TSA and Joel Lofgren of the
19     Department of Homeland Security.
20           THE COURT:  Okay, thank you.
21           Okay.  Mr. Hausken, they're both your motions,
22     to enlarge the period of discovery and then for a
23     protective order, I guess.  There's so many moving parts
24     to both motions that I'm wondering if it would be better
25     for you all to keep your seats and we just take things
```

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

```
 1    issue by issue on both --
 2              MR. HAUSKEN:  Your Honor, we do have a
 3    presentation for the motion to compel, where we have
 4    laid out some of the --
 5              THE COURT:  Aah.
 6              MR. HAUSKEN:  -- things that we have a
 7    PowerPoint that goes with that, if you care to see that.
 8              THE COURT:  Well, I certainly wouldn't want to
 9    get in the way of that.  All right, let's go ahead.
10              MR. HAUSKEN:  So Ms. Jou will handle that for
11    us.
12              THE COURT:  All right.
13              MS. JOU:  Good morning, Your Honor.
14              THE COURT:  Good morning.
15              MS. JOU:  I've got some slides today.  I'll
16    share that with counsel.
17              MR. GRAVELINE:  Thank you.
18              MS. JOU:  May it please the Court.
19              THE COURT:  Yes, ma'am.  Go ahead.
20              MS. JOU:  The Government is here today because
21    SecurityPoint has not produced documents in more than
22    seven months of discovery.  And that matters for three
23    reasons.  First, SecurityPoint has provided a very
24    distorted image of its finances and its assets.  It has
25    redacted hundreds of documents, its financial documents.
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    These redactions cover millions of dollars in assets.
 2    It has refused to produce any valuations that its
 3    investors have provided to its litigation funders or to
 4    its CEO.  It's delayed production of its revenue-sharing
 5    agreements relating to the '460 patent.
 6            The second reason is that SecurityPoint has
 7    provided insufficient information to establish its
 8    standing -- its standing to enforce the '460 patent.
 9            And the third reason is -- relates to our
10    motion for a protective order.  We're seeking some
11    encouragement from the Court to -- for the parties to
12    cooperate.  Some of the discovery that SecurityPoint was
13    seeking relates to attorneys' fees.  SecurityPoint does
14    -- admittedly seeking attorneys' fees, while refusing to
15    unredact the amounts of its attorneys' fees.  In some of
16    -- there are some other examples that we'd like to get
17    into today.
18            THE COURT:  Hmm.
19            Okay, well, can I swap with you?  Do you have
20    mine?  Oh, it's a reply.
21            Well, you can assume I've read everything,
22    both of you.  And let's try to keep the adjectives down
23    to a bare minimum, if we can.  I just need the facts and
24    the legal argument.
25            MS. JOU:  Sure.  I'd like to start, then, with
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1   the redacted financial documents, and that's at tab 1.

2              THE COURT:  Mm-hmm.

3              MS. JOU:  SecurityPoint has produced hundreds

4   of redacted documents and now is claiming that it will

5   produce some more information but only what it deems

6   appropriate.  And, so, we don't have any idea of what

7   kind of information has been withheld in these redacted

8   financial documents.

9              THE COURT:  All right.  So what do you

10  understand Plaintiff's response on this issue to be?

11             MS. JOU:  They haven't told us when they're

12  going to produce --

13             THE COURT:  Right.

14             MS. JOU:  -- the unredacted documents.

15             THE COURT:  Okay.

16             MS. JOU:  They haven't told us why they

17  redacted these documents.  They haven't told us whether

18  they have a privilege claim.  And we'd also like these

19  documents in native format.  The last page on that

20  section, there's a blue sheet entitled GA -- it's page

21  number GA-103.  It's after slide 12.

22             THE COURT:  Mm-hmm.

23             MS. JOU:  So there's a blue sheet in that

24  section, GA-103.  And it's the text in that section --

25  that document is microscopic, so we need the native

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

     1   files.
     2            THE COURT:  Okay.  Well, my shorthand read of
     3   what the Plaintiff is saying is in principle they don't
     4   disagree with this, we'll furnish this at some point
     5   unspecified.
     6            MS. JOU:  And in order for the Court to have
     7   any kind of fair trial on damages --
     8            THE COURT:  No, I agree.  Stay there.  Let's
     9   talk about this one.  You can keep your seat.
    10            MR. GRAVELINE:  Okay.  We will agree, Your
    11   Honor, to go back and unredact some of it.  The portions
    12   that we're going to maintain our redactions over are
    13   simply amounts spent on legal fees and any documents
    14   that would reflect any legal advice about valuation.
    15   Other than that, we will unredact the documents.  And we
    16   can do that promptly.
    17            THE COURT:  Okay.  Define promptly.
    18            MR. GRAVELINE:  Two weeks.
    19            THE COURT:  Okay.  Now, on the legal fees,
    20   that really anticipates a separate question, doesn't it?
    21            MS. JOU:  Yes.
    22            THE COURT:  All right, so, the Plaintiff is
    23   entitled under 1498 to -- I'm trying to recall exactly
    24   what the wording is, but it's entitled to recover its
    25   fees unless the Government's position was substantially

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    justified, I believe, sort of borrowing EAJA.  Which
2    numbered item is legal fees in your presentation?
3              MS. JOU:  It's tab 9 -- or tab 8.
4              THE COURT:  Tab 8, all right.
5              MS. JOU:  Slide 54.
6              THE COURT:  Yeah, you characterize this as a
7    protective order, but, in fact, you want to know what
8    they've been spending on legal fees.
9              MS. JOU:  Well, we don't know what they've
10   redacted on their financial documents.  Certainly many
11   of the redactions come in the asset sections, covering
12   its assets.  And, so, we don't think there should be --
13   we don't know why those assets have been redacted.
14             THE COURT:  Well, we just heard one reason,
15   legal fees, and that's what I want to explore.
16             I need the brief.
17             MS. JOU:  And I'm not sure, Your Honor, that
18   legal fees would fall under assets.  There seem to be
19   many more redactions than just legal fees.
20             THE COURT:  Right.  Well, you must be also
21   looking for expenses as well.  So -- on fees,
22   presumably?  Well, let's -- hang on a second.  Let me
23   find in your brief -- I thought there was an affirmative
24   request for information regarding legal fees.
25             MS. JOU:  No, the Government has not -- this

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    is -- the redactions coming -- what SecurityPoint has
 2    claimed -- has produced for its damages case is its
 3    financial documents, and we're finding lots and lots of
 4    redactions.
 5              THE COURT:  No, I understand, but I thought
 6    there was a specific request by the Government for --
 7              MS. JOU:  No.
 8              THE COURT:  -- information that was withheld
 9    on the grounds that it related to legal fees.
10              MS. JOU:  We did seek some information
11    regarding litigation funding, that it received from
12    third parties and its investors.
13              THE COURT:  Right, okay.  Well, all right,
14    let's talk about fees, then, as a separate item.
15              Mr. Graveline, why would that -- I mean,
16    you're -- you can keep your seat.  That would probably
17    simplify life.
18              Why would the amount Plaintiffs spend on legal
19    fees not at some point anyway be relevant?
20              MR. GRAVELINE:  Your Honor, it would be
21    relevant at some point, and as you note, and we are
22    entitled to legal fees under the statute, and when we
23    are proving up our legal fees, we certainly will provide
24    invoices that show the amount of the fees.  The amounts
25    on the spreadsheet are different from invoices and would
```

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

1    show things like, you know, legal fees to date or
2    something like that.
3              THE COURT:  But what -- why bother to protect
4    them in the interim?  What's the reason for it?
5              MR. GRAVELINE:  You know, I think things that
6    just reflect a number would be one thing, so the number
7    spent on legal fees.  I think we would be concerned
8    about producing things that would show a litigation
9    budget, which I think would be privileged.
10             THE COURT:  Mm-hmm.
11             MR. GRAVELINE:  Or any valuation that was
12   based on a lawyer's assessment.
13             THE COURT:  Fair enough.  So numbers are going
14   to be produced, then.  And, so, assuming things get
15   unredacted within two weeks, what is the second area?
16             MS. JOU:  Relating to the Government's -- to
17   SecurityPoint's litigation funding.  That would be at
18   tab 2.
19             THE COURT:  Litigation funding.  Well, tell me
20   -- I mean, in principle, why would how somebody pays for
21   litigation matter unless it involves a transfer of
22   ownership?
23             MS. JOU:  Why would it matter unless it
24   involved a transfer?
25             THE COURT:  Mm-hmm.

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1              MS. JOU:  We -- well, the Federal Circuit has
 2    looked at litigation funding agreements to determine
 3    standing.  It has affirmed the District Court's
 4    dismissal of a patent plaintiff that had legal title
 5    because of its provisions and its agreements with a
 6    third-party litigation funder.  That is because --
 7              THE COURT:  Right, and if that's the one that
 8    I recall, I'm trying to remember who the Plaintiff was.
 9    Was the Plaintiff the one that was trying to horn into
10    the litigation?  I think it was.  What was the name of
11    that case?
12              MS. JOU:  Enhanced Security Research, LLC, was
13    the District of Delaware.
14              THE COURT:  No.
15              MS. JOU:  It was in our reply brief.
16              THE COURT:  Hmm.
17              MS. JOU:  Because the Federal Circuit requires
18    -- in assessing standing, you're required to review the
19    actual provisions and the substance of what was
20    transferred.  And a very critical right in assessing
21    standing is the right to enforce the patent, the right
22    to make litigation decisions freely, to make settlement
23    decisions freely.  Some of the materials we've cited
24    indicates that there was a third party investing
25    millions of dollars, and those investments come at key
```

SecurityPoint Holdings, Inc. v. USA                           11/1/2017

1    points in this litigation.  And whether that means they

2    have some influence over this litigation and the

3    decision to settle will affect its standing.

4              THE COURT:  The decision to settle?

5              MS. JOU:  Or the right to enforce the patent,

6    so --

7              THE COURT:  Right.

8              MS. JOU:  -- the decision to -- how it

9    litigate this case, how SecurityPoint will litigate this

10   case, how SecurityPoint --

11             THE COURT:  Well, what business is it of -- no

12   offense -- of the Government's how the Plaintiff decides

13   to litigate its case?

14             MS. JOU:  It's relevant to whether the

15   Plaintiffs have standing to enforce the patent.

16             THE COURT:  Right, but let's talk about what

17   that means.  Doesn't that devolve down to who owns the

18   patent and when did they own a right in it?

19             MS. JOU:  And that's what we need these

20   litigation funding agreements to see what rights were

21   transferred --

22             THE COURT:  Okay.

23             MS. JOU:  -- in relation to these millions of

24   dollars of investments that it received.

25             THE COURT:  So narrow down to were there any

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

```
 1   agreements, but what -- it wouldn't be limited, would
 2   it, to litigation funding?  I mean, the Plaintiff could
 3   simply have sold rights in the patent.
 4             MS. JOU:  And we'd like to know about that as
 5   well.
 6             THE COURT:  Right.
 7             MS. JOU:  And we haven't got that.
 8             THE COURT:  Was that a different bullet?
 9             MS. JOU:  Well, I'll just show you the
10   response that we've received from SecurityPoint.  It's
11   on slide 15.  SecurityPoint stated that it was not aware
12   of any relevant nonprivileged documents.  It made no
13   relevance objection.  We did not know that these
14   documents existed.  We had to do our independent
15   investigation to prove that -- this statement.
16             THE COURT:  All right.  Why would it not be
17   relevant on standing, which theoretically is
18   jurisdictional, to know whether or not the Plaintiff --
19   all right, I may be "mooshing" a couple of issues
20   together, but whether the Plaintiff owned at the time of
21   filing all rights to the patent.
22             MR. GRAVELINE:  Yeah, and the answer to that
23   is yes, and I believe we have produced all relevant
24   assignment documents, and there has been no transfer of
25   ownership.  So there's no document -- the document that
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1   counsel seems to be looking for just doesn't exist, so
2   our answer to the request was accurate.
3              THE COURT:  All right.  So if there is
4   litigation funding by some third party, you're telling
5   me that that did not involve any transfer of ownership.
6              MR. GRAVELINE:  Correct.
7              THE COURT:  If that's accurate, why would
8   anything beyond that be relevant?
9              MS. JOU:  Your Honor, first of all, I think
10  it's not -- it's Plaintiff's burden to establish its
11  jurisdiction here -- this Court's jurisdiction.  They
12  can't just make these bare statements saying that
13  they've never assigned the patent.  And the Federal
14  Circuit doesn't look at documents titled assignments.
15  They look at provisions of agreements that transferred
16  rights, and that could include litigation funding
17  agreements.
18             But also, secondly, the amount of this money
19  that they've received is also relevant to damages.  It's
20  relevant to SecurityPoint's profit and loss
21  determinations that we still don't have.  I mean, how --
22  what it counts as an asset, what it counts as profit
23  from its business.  SecurityPoint --
24             THE COURT:  What's the -- well, let's talk
25  about that one first.  Profit and loss down the road

1    from selling its intellectual profit, yeah, sure, that

2    would be relevant, but if it borrows money or -- well,

3    borrowing, that wouldn't affect the profit or loss on

4    the -- to litigate, would not affect the Georgia-Pacific

5    factors.

6             MS. JOU:  Borrowing, we would still need to

7    see the terms of the provision to see what rights were

8    transferred at --

9             THE COURT:  Well, tell me what kind of right

10   would be transferred that would be relevant here to

11   standing.

12            MS. JOU:  It would be the right to freely

13   enforce the patent, to make litigation decisions, to

14   make settlement decisions, also the right if -- if this

15   -- the right to assign SecurityPoint, if SecurityPoint

16   has a right to the '460 patent.  Sometimes in these

17   litigation funding agreements, SecurityPoint is not

18   allowed to, for example, assign the patent to a third

19   party during the course of the litigation.  All of these

20   things matter to who has standing to enforce the patent.

21            And an analogy I can give you is if the bank

22   gives you a loan for your house, you own the house and

23   you have the deed, because all the bank is doing is

24   giving you money.  But once the bank starts telling you

25   who can live in your house, who you're allowed to rent

SecurityPoint Holdings, Inc. v. USA                              11/1/2017

1    it to, and once the bank says it wants a percentage of

2    your rental income, then it starts blurring the lines

3    into what -- who actually owns the house at that point.

4              THE COURT:  Well, all right.  Let's assume

5    that those kinds of rights would be relevant here.  What

6    assurance does the Government have that they don't

7    exist?

8              MR. GRAVELINE:  There just is no such document

9    that transfers any of those rights, the rights to settle

10   the case.  The rights to the patent simply just had not

11   been assigned.  It's different from the case that Ms.

12   Jou relies upon.

13             THE COURT:  In what way?

14             MR. GRAVELINE:  We don't have an assignment

15   here.

16             THE COURT:  Well, all right, so what is

17   somebody getting in exchange for investing in the

18   litigation?

19             MR. GRAVELINE:  I think, Your Honor, we don't

20   have a litigation funding agreement.  I can represent

21   that.  We have investors who have invested in the

22   company, but there's not sort of a classic litigation

23   funding agreement as counsel seems to think there is.

24             THE COURT:  Okay.

25             MS. JOU:  And, Your Honor, I can respond to

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

1    that that Enhanced Security Research from the District
2    of Delaware was a company created by the inventor.  The
3    inventor transferred his rights to the company, and then
4    a litigation funding firm created a separate shell
5    company and the agreements were between the shell
6    company and the Plaintiff.
7            And it was the -- and it wasn't -- it wasn't a
8    classic litigation funding agreement.  It was just an
9    agreement between two -- it was called a purchase
10   agreement between two companies.  It seems -- it was the
11   purchase agreement, and I'm not sure what kind of
12   purchase agreement it was, but, you know, the Federal --
13   the District Court there actually examined the specific
14   provisions of that agreement to see what actually was
15   transferred.
16           And that's what the Federal Circuit is
17   requiring in last year's Diamond Coating Technologies.
18   This is a Federal Circuit case from 2016.  They
19   explicitly said you're not -- you can't just look at
20   bare title -- bare formalities.  You can't look at a
21   document just that's called an assignment.  You need to
22   look at the provisions, what rights were transferred,
23   and a critical right is the right --
24           THE COURT:  Tell me what question you asked
25   that you think you're not getting an answer to.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1              MS. JOU:  It's on slide 14.  It's RFP Number
 2    41.  And it's -- the request is all documents,
 3    communications, and things, including but not limited to
 4    the valuation document, relating to the Plaintiff's --
 5    documentation relating to the Plaintiff, the patent in
 6    suit, which were prepared or provided to obtain
 7    litigation funding, including but not limited to Raptor.
 8    And SecurityPoint's response was it was not aware of any
 9    relevant nonprivileged documents that are responsive to
10    this request.
11              THE COURT:  Okay.
12              MS. JOU:  And we didn't -- we didn't have --
13    we didn't know that they were going to withhold any
14    information based on this response.
15              THE COURT:  There's no relevance objection
16    here?
17              MR. GRAVELINE:  There is a relevance
18    objection, yes.
19              THE COURT:  Oh.
20              MR. GRAVELINE:  Any litigation funding
21    agreement was not relevant to any issue in the case, and
22    I think it's well established that those sorts of
23    documents are covered by the attorney/client privilege
24    and the work product doctrine.
25              THE COURT:  Wouldn't that depend on whether or
```

SecurityPoint Holdings, Inc. v. USA                      11/1/2017

1     not there's any assignment of rights?

2                 MR. GRAVELINE:  And there has not been an

3     assignment of rights.

4                 THE COURT:  Now, the request was for venture

5     capital.  Why would investments in Plaintiff not be

6     relevant?

7                 MR. GRAVELINE:  We can produce documents that

8     relate to investments, and I believe we have produced

9     the majority of those documents.

10                THE COURT:  Hmm.  Raptor Accelerator?

11    What's -- it is -- what is its role?

12                MR. GRAVELINE:  They're an investor, Your

13    Honor.

14                THE COURT:  Does the Government have those

15    documents?

16                MR. GRAVELINE:  I believe so, and we can

17    certainly check.  And if there's any more, we can

18    produce them.

19                MS. JOU:  Your Honor, we have not received

20    those documents.  We've separately subpoenaed Raptor,

21    and they've hired Mr. Graveline's firm to represent them

22    in the subpoena.  So we're not getting documents.  We

23    haven't gotten documents in the last seven months, Your

24    Honor.

25                Then their response is that there were no

SecurityPoint Holdings, Inc. v. USA                              11/1/2017

```
 1    relevant documents.  We had to go looking at public
 2    sources.  We looked up SEC filings to establish there
 3    was about $8 million in investments that we weren't told
 4    about.  It seems significant, and it seems there would
 5    be some rights exchanged, or there could be that need to
 6    be examined for what rights they received.
 7             And in addition, we're also looking for
 8    valuation documentation, and that's not covered by -- at
 9    least they haven't raised any privilege claim about this
10    valuation.  Certainly when investors invest in your
11    company, they discuss what that valuation -- what that
12    investment is worth and how -- how they're going to
13    value that.  The case -- the Government has cited two
14    cases in patent -- in patent.
15             THE COURT:  Valuation documents?
16             MR. GRAVELINE:  We can produce all ownership
17    and valuation documents.  We're not objecting to that.
18             THE COURT:  Well --
19             MR. GRAVELINE:  What we are objecting to would
20    be privileged communications where there was any sort of
21    an assessment of value by a lawyer.
22             MS. JOU:  And --
23             THE COURT:  Well, that's -- it doesn't sound
24    like that's the basis for the prior nonproduction.  All
25    right.  For the time being, I'm going to assume that the
```

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

```
 1   Government is going to get anything remaining on Request
 2   41 related to valuation.
 3            MS. JOU:  Your Honor, can I just clarify?  Is
 4   that -- will that -- is there going to be privileged
 5   information?  What is SecurityPoint claiming as its
 6   privilege?  What will SecurityPoint be withholding?
 7            THE COURT:  Oh, I don't know.
 8            MS. JOU:  It sounds -- I mean, litigation
 9   funding documents, even in the cases that SecurityPoint
10   cited, even if they reflect an attorney's opinions, are
11   not privileged.
12            THE COURT:  As I was saying, I'm going to
13   assume that Plaintiff is going to respond to everything
14   on this list.  With respect to litigation funding, I'm
15   taking Mr. Graveline's representations at face value
16   that none of the litigation funding carries with it any
17   transfer of rights or interest in enforcement of the
18   patent or management of the litigation.
19            MR. GRAVELINE:  That's correct, Your Honor.
20            THE COURT:  And then the rest of it I assume
21   the Government will be getting to the extent that it's
22   not privileged.  Now, would that come with a privileged
23   log?
24            MR. GRAVELINE:  We would be happy to produce a
25   privilege log as well.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

```
 1                THE COURT:  All right.
 2                MR. HAUSKEN:  Your Honor, in that respect, if
 3    I may, it has been the practice of both parties not to
 4    create huge, burdensome privilege logs.  And, so, if
 5    they want to do it just for that issue, that would be
 6    acceptable to the Government.  I don't think it's
 7    helpful to either party to ask for broad privilege logs
 8    at this point in time after the length of time of this
 9    litigation.
10                THE COURT:  Okay.  Thank you.
11                Item 3.
12                MS. JOU:  This is --
13                THE COURT:  Well, we're still on 41.  We've
14    talked about that.
15                MS. JOU:  This is at tab 3.  This is also in
16    addition to Raptor.  It's the other investors, and I
17    think we've covered this --
18                THE COURT:  Right.
19                MS. JOU:  -- that SecurityPoint will produce
20    relating to its other investors.  There's -- a separate
21    and related issue is SecurityPoint Media, LLC.  That's a
22    subsidiary, or at least SecurityPoint said in trial that
23    it's a subsidiary of the Plaintiff.  There appears to --
24    we also want the operating agreements related to
25    SecurityPoint Media, LLC.
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1                THE COURT:  All right.  Now, is this in
 2    connection with who the real party in interest is?
 3                MS. JOU:  No.  It's in connection with who --
 4    which party owns the patent.  There are two different
 5    parties named SecurityPoint Media, LLC.  One of these is
 6    a success -- a predecessor in interest to the current
 7    plaintiff.  Another -- another company named
 8    SecurityPoint Media, LLC was asserting the '460 patent
 9    in litigation in the Middle District of Florida in 2007.
10    And, so --
11                THE COURT:  Okay.
12                How about clearing up that issue.
13                MR. GRAVELINE:  I believe that is clear, but
14    if there's anything else, we're happy to produce it.
15                THE COURT:  Well, all right, the litigation
16    was brought initially by whom?
17                MS. JOU:  SecurityPoint Media, LLC.  That's
18    slide 27 is a --
19                THE COURT:  All right, now, what's the
20    connection between Security -- well, let me ask
21    Plaintiff -- SecurityPoint Holdings, Inc. And whoever
22    was named originally?  Didn't we substitute somebody in
23    a long time ago?
24                MR. GRAVELINE:  I believe we did, Your Honor.
25    And, again, I don't have all the details about this
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    right at hand, but we can make sure that any assignment
 2    documents are produced.  And I believe they have been.
 3              MS. JOU:  And let me -- I can just clarify
 4    that.  The -- your initial Plaintiff in this case was
 5    SecurityPoint Holdings, LLC, and it's now been
 6    substituted with SecurityPoint Holdings, Inc.
 7              THE COURT:  Hmm.
 8              MS. JOU:  Before SecurityPoint Holdings, LLC,
 9    it was an entity called SecurityPoint Media, LLC.  The
10    date that it changed its name from SecurityPoint Media,
11    LLC to SecurityPoint Holdings, LLC, was January 15th,
12    2007.  A separate entity, which is not the predecessor
13    in interest, was created on January -- two days -- so
14    this is slide 25.  From the predecessor in interest to
15    this Plaintiff currently is -- was operating under the
16    name Security -- SecurityPoint Media, LLC from 2006
17    through January 15th, 2007.  It changed its name to
18    SecurityPoint Holdings January 15th, 2007.
19              Two days later, and that's the next slide, on
20    slide 26, a new entity was created effective January
21    17th, 2007.  That entity was also named SecurityPoint
22    Media, LLC.  And then two months later, on the next
23    slide, slide 27, an entity called SecurityPoint Media,
24    LLC asserted the '460 patent.  Now that entity, the
25    second SecurityPoint Media, is not a predecessor in
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    interest to the current Plaintiff in this case.

2              And, so, if SecurityPoint has -- we have not

3    seen any assignment done.

4              THE COURT:  Hang on.

5              MR. GRAVELINE:  We will produce anything we

6    have on that and clear this up.  Again, I don't have the

7    facts at hand.  You know, this all sounds very

8    nefarious, but there -- it's not.  We will produce any

9    assignment documents that have not yet been produced.

10             THE COURT:  Well, all right.  I'm surprised at

11   the iterations of the Plaintiff aren't well known.

12             MR. GRAVELINE:  I believe they are, Your

13   Honor.  I believe this was known many, many years ago by

14   counsel, so...

15             MS. JOU:  And one more issue, and this is

16   slide 30, that the Patent Office -- or slide 29, that

17   the Patent Office records for assignment of the patent

18   show that the patent was assigned to an entity called

19   SecurityPoint Media, Inc.

20             THE COURT:  Mm-hmm.

21             MS. JOU:  And that's not SecurityPoint Media,

22   LLC that asserted the patent.  And it doesn't seem to be

23   a predecessor in interest to this Plaintiff.  And that

24   assignment agreement, there's an excerpt of that in

25   slide 30.  That was -- that assignment was executed in

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    July 2003.
 2              THE COURT:  Mm-hmm.
 3              MS. JOU:  The next slide, slide 31, is a
 4    corrected worldwide assignment that was executed after
 5    this litigation was commenced.  And that purports to
 6    correct the assignment that was previously made to
 7    SecurityPoint Media, Inc.
 8              THE COURT:  Mm-hmm.
 9              MS. JOU:  And that's relevant because the
10    Federal Circuit has held that the Plaintiff, on the day
11    that it filed suit, must have standing to assert the
12    patent.  And if there's a mistake, a retroactive
13    assignment doesn't fix that for standing purposes.
14              THE COURT:  Retroactive assignment?
15              MS. JOU:  And, so, this is -- slide 31 is an
16    example --
17              THE COURT:  No, but it -- well, all right.  I
18    agree it appears scrambled and it has to be cleared up,
19    but at the end of the day, as long -- if the pea under
20    the pod is only a single patent and that's the one at
21    issue here, isn't the solution potentially to substitute
22    a different party with an amendment back under Rule 15?
23              MS. JOU:  Well, so, they've cited the case
24    called Abraxis out of the Federal Circuit in 2010, and
25    these were mistakes made -- the patent owners were
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    subsidiaries of a pharmaceutical company, AstraZeneca,
 2    and they had transferred the patents between each other
 3    and by mistake also sold off patents before they had
 4    been properly assigned.  And even in that case there was
 5    no nefarious -- there was no intent -- there was no
 6    finding that this was done for a bad purpose.  It was
 7    just a mistake.
 8             THE COURT:  Um-hum.
 9             MS. JOU:  But even in that case the Federal
10    Circuit held that you can't go back and fix the mistake.
11    You can't fix it.  You have -- you have to dismiss it.
12    These --
13             THE COURT:  I'd be surprised.  It seems to me
14    we're not talking about fixing something with the Patent
15    Office.  We're talking about fixing something in this
16    litigation.
17             MS. JOU:  It's fixing --
18             THE COURT:  Well, whatever -- I need to know the
19    facts.  So I will task the Plaintiff with creating
20    whatever historical record we need to have to make sure
21    that the right entity is in front of me.
22             MR. GRAVELINE:  We will do that, Your Honor.
23             THE COURT:  Okay.  Now, is that the Clear Channel
24    issue?
25             MS. JOU:  That's tab 4.  Clear Channel is a
```

SecurityPoint Holdings, Inc. v. USA          11/1/2017

1    separate request for production.  It's number 47.

2    SecurityPoint hasn't disputed the relevance of its

3    litigation with Clear Channel.  And just to give you

4    some background on what Clear Channel is, SecurityPoint

5    operates in airports, and in some of these airports they

6    have an exclusive advertising broker.  And so in order

7    for SecurityPoint to enter into these airports, they

8    have to sign a revenue-sharing agreement with the

9    exclusive ad broker.

10        Clear Channel is one of those, and Clear

11    Channel's response -- we requested documents from their

12    litigation with Clear Channel.  SecurityPoint's response

13    was that it was not presently aware of any relevant,

14    nonprivileged documents that are responsive to this

15    request.  That's slides 33 and 34.

16        But that doesn't seem to be true in that in slide

17    35, the Clear Channel litigation settled in January

18    2017.  It's been more than ten months, and we still

19    haven't gotten any Clear Channel litigation documents.

20    And in that Clear Channel litigation, Clear Channel --

21    it settled shortly after Clear Channel moved to amend

22    its complaint, and it accused SecurityPoint of scheming

23    to inflate operational expenses and conceal contracts,

24    and it accused SecurityPoint of failing to properly

25    account for all revenues, fees, and costs in accordance

SecurityPoint Holdings, Inc. v. USA

1    with the agreement.

2         And so we would like information from this Clear

3    Channel litigation.  Much of the -- much of the filings

4    are under seal --

5         THE COURT:  Oh.  And so is there a reported

6    opinion in this case?

7         MS. JOU:  No.  The case settled after Clear

8    Channel moved to amend its complaint with these

9    additional allegations about SecurityPoint's record

10   keeping practices.

11        THE COURT:  What precisely are you saying you're

12   entitled to that would be relevant from the Plaintiff's

13   litigation files?

14        MS. JOU:  Well, certainly the settlement

15   agreement, because SecurityPoint and Clear Channel have

16   a revenue-sharing agreement that relates to the '460

17   patent, so how much -- the settlement agreement relates

18   to what SecurityPoint has received in this agreement

19   relating to the '460 patent, but we're also --

20        THE COURT:  Well, where did you get the

21   complaint?

22        MS. JOU:  We haven't gotten the full complaint.

23   I think public portions of it were available on the

24   docket, and so we've downloaded those, but beyond that,

25   there are many -- many of the filings are sealed, and

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    certainly the settlement agreement is something we would
 2    like to see, and it's relevant to damages.
 3            THE COURT:  What is the connection between Clear
 4    Channel and the Plaintiff?
 5            MR. GRAVELINE:  There is no connection, Your
 6    Honor.  They were just involved in litigation against
 7    each other.
 8            THE COURT:  I mean --
 9            MR. GRAVELINE:  They had agreements to operate in
10    airports, and we're not objecting to producing those.
11    We are objecting to producing things like the settlement
12    agreement, which I don't think settlement of litigation
13    is relevant to any damages issues in the case.  The only
14    concern is, because as counsel noted, a lot of these
15    documents were filed under seal, and since we have
16    confidentiality obligations, we have to coordinate this
17    with Clear Channel.
18            THE COURT:  Well, when I asked what the
19    connection was, I mean, is it -- is Clear Channel a
20    licensee under the Plaintiff's patent?
21            MR. GRAVELINE:  I don't believe so, Your Honor.
22    I do think there were some licensing terms, but it's a
23    different sort of license.  Clear Channel doesn't --
24    unlike TSA -- have the right to operate the checkpoints.
25    So Clear Channel wouldn't have the right to directly
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    practice the method claims in the patent.

2            MS. JOU:  And, Your Honor --

3            THE COURT:  The settlement agreement, does that

4    assume an ongoing relationship between the Plaintiff and

5    Clear Channel?

6            MR. GRAVELINE:  I don't know, but I don't believe

7    so.

8            THE COURT:  Why would the settlement agreement be

9    available to third parties?

10           MS. JOU:  Well, we separately subpoenaed Clear

11   Channel, and they've -- you know, they've referred all

12   of this back to SecurityPoint, but SecurityPoint --

13   since SecurityPoint is the party in this litigation, we

14   should get all these documents from SecurityPoint, but

15   it matters to the Government because Clear Channel and

16   SecurityPoint split revenues related to the advertising

17   on the bins at the checkpoints and related to the '460

18   patent.

19           If we don't have a -- we don't have a clear

20   picture of what SecurityPoint's revenues are, what

21   portion of it came from Clear Channel, what portion of

22   it came from other airports, we need -- we need to have

23   this documentation to --

24           THE COURT:  Well, let's assume there wasn't any

25   litigation.

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1          MS. JOU:  There wasn't -- okay.

2          THE COURT:  Let's assume there wasn't --

3          MS. JOU:  All right.

4          THE COURT:  -- between Clear Channel and

5     Plaintiff.  Would you still be asking for any operating

6     agreements between the two?

7          MS. JOU:  Yes, and that's the subject of the next

8     tab, tab 5, which --

9          THE COURT:  Hang on.

10         MR. GRAVELINE:  We will produce those documents

11    if they haven't produced.

12         THE COURT:  All right.

13         MS. JOU:  And -- well, relating to --

14         THE COURT:  But the settlement agreement -- hmm,

15    I don't know.  I'll tell you what, let's see what gets

16    kicked out after you have this consultation with Clear

17    Channel, although it sounds like they've punted to the

18    Plaintiff.  It sound as if the Plaintiff's dealings with

19    Clear Channel would be relevant on the issue of damages,

20    and so I think the Government is entitled to anything

21    that's not privileged in that regard.

22         The settlement agreement, I'm not saying yea or

23    nay, because I -- you know, I can imagine that there

24    would be elements of the settlement agreement that would

25    be confidential, but if it relates to -- if it has any

SecurityPoint Holdings, Inc. v. USA

1    backspin in terms of affecting how the revenues are

2    split or -- you know, I think the Government's entitled

3    to know how much money the Plaintiff is making off of

4    its patent, and if the settlement affects how that was

5    calculated in this case, then I think it's probably

6    discoverable.

7          In any event, whatever the ongoing relationships

8    are between the parties, it sounds as if it would be

9    discoverable unless it's otherwise privileged.

10         MS. JOU:   The next tab is related to this.

11   It's -- in addition to Clear Channel -- this is slides

12   37 and 38.   In addition to Clear Channel, there are

13   other advertising brokers that have agreements with

14   SecurityPoint related to the '460 patent.   When we asked

15   for these agreements, SecurityPoint responded it was not

16   aware of any relevant responsive and nonprivileged

17   documents.

18         Again, the next page, on slide 39, SecurityPoint

19   cited these agreements with Clear Channel and with

20   JCDecaux more than four years ago.

21         THE COURT:   Why would -- why would whatever

22   revenue the Plaintiff generates from the patent from

23   others besides Clear Channel not be relevant?

24         MR. GRAVELINE:   And we have agreed to produce

25   those documents as well, Your Honor.   I don't think

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    there's an issue there.

2              MS. JOU:  Okay, just --

3              THE COURT:  And when are we talking about?  How

4    soon?

5              MR. GRAVELINE:  Three weeks?

6              MS. JOU:  Okay.

7              THE COURT:  Okay.

8              MS. JOU:  And in SecurityPoint's opposition, they

9    also said they would produce them if appropriate, and

10   we're concerned about that appropriateness objection.

11             THE COURT:  Well, I think I've made it clear.

12             MS. JOU:  Okay.

13             THE COURT:  They are discoverable unless they are

14   privileged, and --

15             MS. JOU:  Thank you.

16             THE COURT:  -- they will be identified if they

17   are privileged.  I would expedite things by going ahead

18   and doing a privilege log, but I'm not going to require

19   it.

20             Now, divorce proceedings.

21             MS. JOU:  That's slide 41.  The Government has

22   narrowly limited this request to the valuations of the

23   patent and of SecurityPoint and of its assets from the

24   divorce proceedings.  We're not asking for anything else

25   but the valuations.

SecurityPoint Holdings, Inc. v. USA                     11/1/2017

```
 1            THE COURT:  Um-hum.
 2            MS. JOU:  And that's relevant because this -- the
 3   patent was acquired during this marriage.  The ownership
 4   in SecurityPoint was also acquired during this marriage.
 5   Those are probably the two most significant assets, and
 6   under Florida law, they are going to be equitably
 7   distributed.  So we -- we --
 8            THE COURT:  If they were valued by the Plaintiff,
 9   why wouldn't that be relevant?
10            MR. GRAVELINE:  I think any valuation that was
11   done during a divorce proceeding would be totally
12   different from a valuation in this case.  A family court
13   judge is not going to apply the Georgia-Pacific factors
14   to figure out what a reasonable royalty would be.  So
15   what counsel is looking for is basically like the future
16   value.  You know, they're trying to get at, you know,
17   what the patent might be worth in the future, after
18   litigation occurs, and things like that.
19            THE COURT:  The Plaintiff presumably took a
20   position in the divorce proceedings about what these
21   patent rights were worth.
22            MR. GRAVELINE:  You know, I'm not sure, Your
23   Honor, and it was Mr. Ambrefe.  The patent is owned by
24   SecurityPoint.
25            THE COURT:  Yeah, right.  I'm sorry, right.
```

1          MR. GRAVELINE:  Yeah.

2          THE COURT:  Hmm.  So it would be him valuing his

3    stock ownership in the Plaintiff?

4          MR. GRAVELINE:  I believe that's what counsel's

5    looking for, yeah.

6          THE COURT:  And how many other assets does the

7    Plaintiff have besides the patent?

8          MR. GRAVELINE:  I mean, his home and, you know,

9    investments, things of that nature.

10         THE COURT:  The Plaintiff corporation?

11         MR. GRAVELINE:  No, Mr. Ambrefe, which is what

12   counsel is looking for in the divorce proceedings.

13         THE COURT:  No, I understand, but, I mean, if

14   he's valuing the stock in SecurityPoint, what is he

15   valuing other than the patent?

16         MR. GRAVELINE:  I think it would be difficult to

17   value at that point in time certainly for the purposes

18   of a divorce proceeding, where you're not talking about

19   what patent damages might be down the road.  The issue

20   before the Court currently is what the royalty should be

21   based on the Georgia-Pacific factors, not what the value

22   of an asset was either before or very early in

23   litigation.

24         THE COURT:  I don't agree.  I think -- I mean, it

25   may be very, very remote, but I think the Government's

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

 1    entitled to argue from it.  So go ahead and produce

 2    that.

 3          MR. GRAVELINE:  Limited to just valuation of the

 4    patent or stock in the company, correct?

 5          THE COURT:  Or stock in the company, right.

 6          MS. JOU:  The next tab is tab 7, and it's RFP

 7    Number 100 to 112.  These are at slides 47 and 48.  This

 8    relates to TSA's use -- SecurityPoint's use of TSA's

 9    logos and seals.

10          THE COURT:  Um-hum.

11          MS. JOU:  And SecurityPoint here makes a

12    relevance objection that's much different from its prior

13    relevance objections.  They -- at slide 50, the

14    Government pointed out SecurityPoint does not dispute

15    that it uses TSA's logos, and at slide 50, we give an

16    example of TSA's use of -- identifies TSA as a partner.

17          THE COURT:  Um-hum.

18          MS. JOU:  And also SecurityPoint did not dispute

19    in its opposition that it has offered to license the

20    '460 patent to TSA at no charge.  This is relevant to

21    the Georgia-Pacific factor of the commercial

22    relationship between TSA and SecurityPoint.  This is not

23    a typical -- any hypothetical negotiation between the

24    parties is not a typical competitor-to-competitor

25    relationship, where SecurityPoint can claim a higher

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    royalty rate if T -- if the Government were a typical

2    competitor, but instead SecurityPoint has held TSA out

3    as a partner.  That's a different relationship, and that

4    has a different value, and it affects the royalty rate

5    that should be applied here.

6         THE COURT:  "Copies of all documents that tend to

7    relate to your use of the official" -- I wouldn't know

8    how to begin answering that question.  That tend to

9    relate?

10        MS. JOU:  And we have also served other requests

11   related to their valuation of the use of this -- of the

12   logo and --

13        THE COURT:  Let's look at that one.

14        MS. JOU:  That's not in my slides.  It's -- it

15   should be -- it's at GA-2 -- GA-195 in our appendix.  I

16   can pull it up if --

17        THE COURT:  Let me see if that's one that I have.

18        MS. JOU:  I can put that up on the screen as

19   well.

20        THE COURT:  I don't have it.  Am I looking at --

21   are you looking for a request for admission or an

22   interrogatory?

23        MS. JOU:  We have both.  We have requests for

24   production related to TSA's logos and as well as

25   interrogatories related to the valuation -- how

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

SecurityPoint Holdings, Inc. v. USA                        11/1/2017

1    SecurityPoint valued the use of the logo.

2         THE COURT:  All right.  Well, we're looking for

3    that interrogatory, then, okay.

4         MS. JOU:  Yeah, that's --

5         THE COURT:  Where is it?

6         MS. JOU:  191 is one example, GA-191.

7         THE COURT:  Twenty-nine or 30?

8         MS. JOU:  Both are -- they're similar, but 29

9    starts with, "Please describe in detail the benefits,

10   financial and otherwise, derived by you from your use of

11   the official seal, main logo, and trademark of DHS TSA."

12        Then the next one, interrogatory number 30, is,

13   "Please describe in detail the benefits, financial and

14   otherwise, derived by you from referring to TSA as among

15   your partners."

16        And we -- in our -- in our slides, we have

17   identified slide 51 -- SecurityPoint makes

18   presentations.  They point out that they're willing to

19   offer the patented system at no cost to TSA.  They point

20   out that -- this is at slide 51, so that's from GA-270,

21   and this is a presentation that SecurityPoint has made.

22   It -- the first --

23        THE COURT:  I'm not sure -- what's the

24   connection?  They want the right to sell advertising, I

25   assume?

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

 1          MS. JOU:  And in the second bullet point there,
 2     SecurityPoint is talking about its relationship with TSA
 3     to other parties.
 4          THE COURT:  Right.
 5          MS. JOU:  So its connection to TSA has some value
 6     that affects --
 7          THE COURT:  Well, that's -- I'm -- I expect to
 8     see that argument, but what precisely is the question
 9     you're putting to -- let's go back to the interrogatory.
10          MS. JOU:  The value of the use of TSA's --
11          THE COURT:  Wait a minute.  "...benefits,
12     financial or otherwise, derived by you" -- well, before
13     I start mouthing off on that, let me hear from the
14     Plaintiff.
15          MR. GRAVELINE:  I do not see the relevance to any
16     of this, Your Honor, and I'm not sure how those
17     interrogatories could possibly be answered.  I feel
18     fairly confident that there is no documents where
19     anybody tried to assess the value of the use of any of
20     these logos.  So beyond that, I just -- I don't know the
21     relevance or what they're looking for or even how we
22     would go about answering this interrogatory.
23          THE COURT:  Well, I'm not going to agree that
24     it's irrelevant.  It may or may not be relevant, but one
25     of the Georgia-Pacific factors is the commercial

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    relationship between the parties, and I would fully
 2    expect the Government to argue that Plaintiff is getting
 3    some benefit from it.  But whether the Plaintiff has
 4    calculated that already, I'm not going to require the
 5    Plaintiff to calculate it.
 6              So I'm going to assume that the answer to the
 7    interrogatory is we haven't done that calculation or
 8    there are no documents reflecting that.  Is that
 9    accurate?
10              MR. GRAVELINE:  I believe that is accurate, Your
11    Honor.
12              THE COURT:  And the document request is just too
13    flabby, but if it amounts to the same thing -- namely,
14    have you done any calculations -- then I'm going to
15    assume the answer would be the same.  But I'm not saying
16    that the subject is irrelevant.  If you want to fine
17    tune some document or -- have you done depositions yet?
18              MS. JOU:  No, Your Honor.
19              THE COURT:  All right.  I'm not saying it would
20    be off limits in a deposition.  Okay.
21              MS. JOU:  And that's the last of our issues
22    relating to the motion to compel, but we have some
23    issues in the motion for protective order as well in tab
24    8.
25              THE COURT:  Right.
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1          MS. JOU:  The first relates to discovery requests
 2     regarding attorneys' fees, and that's at slide 54.
 3     These discovery requests --
 4          THE COURT:  I'm not going to require you to
 5     answer those.
 6          MS. JOU:  Thank you.
 7          THE COURT:  RFP-3, 1, 4, and 5.  The same on 6,
 8     7, and 8.  Let's see, 11, 12, and 18.  Okay.
 9          MS. JOU:  The next slide, slide 58, SecurityPoint
10     has also sought discovery into opinions of counsel, and
11     in their opposition brief, they didn't dispute that
12     opinions of counsel in patent cases typically arise with
13     respect to willful infringement, which is not an issue
14     that comes up under --
15          THE COURT:  Oh, right.
16          MS. JOU:  -- Section 1498, but now in their
17     opposition they're saying that this is relevant to
18     attorneys' fees, and they claim that in a single
19     footnote without any authority.
20          THE COURT:  I'm not going to require that either.
21          MS. JOU:  Thank you.
22          THE COURT:  And I'm not going to require
23     discovery about discovery.  So to the extent that one of
24     the 30(b)(6)s was somebody who can sort of unpack the
25     discovery chain, I'm not going to require that.
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
1          MS. JOU:  Thank you.
2          MR. GRAVELINE:  Your Honor, could I address that
3     point just briefly?
4          THE COURT:  Okay.
5          MR. GRAVELINE:  We're not as much concerned about
6     unpacking the discovery chain as we are about finding
7     out if any documents exist and what was searched for.  I
8     think this really is a key issue.  The Government has
9     taken a position that it does not have records of when
10    it used carts and trays at the checkpoints, and that's
11    really what we're trying to get to, and to have
12    witnesses --
13         THE COURT:  And I will let you do it, but there
14    will not be a separate 30(b)(6) witness for that sole
15    purpose.
16         MR. GRAVELINE:  Um-hum, okay.
17         THE COURT:  You are welcome to pursue that
18    through any witnesses who show up in response to other
19    30(b)(6) requirements.
20         MR. GRAVELINE:  Okay.
21         THE COURT:  Yep.
22         Anything else?
23         MS. JOU:  And then our last is slide 62.
24    SecurityPoint had a number of duplicative discovery
25    requests that were often copied verbatim from its prior
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

 1   requests.

 2              THE COURT:  Um-hum.

 3              MS. JOU:  And we just think this is outside the

 4   bounds of Rule 26.

 5              THE COURT:  Well, if they're duplicative and

 6   you're satisfied you've answered them, tell them that.

 7              MS. JOU:  Okay.

 8              THE COURT:  But I gather what they have done is

 9   simply replicated their discovery requests for the first

10   ten for everything else.  If you've already answered it

11   with respect to the first ten, you don't need to answer

12   it again, but I don't know any other way that they would

13   ask those same questions for the other airports, if I

14   understand what's going on.  But I'm not going to ask

15   the Plaintiff to weed through that.  If you think you've

16   answered it, then say that.

17              MS. JOU:  Okay.

18              THE COURT:  All right.

19              Who's going to do the other --

20              MS. JOU:  Thank you, Your Honor.

21              MR. HAUSKEN:  Would you like me to come up to the

22   podium or --

23              THE COURT:  Sure, that's fine.

24              Okay, remind me where you are on your other

25   motion for an extension of time.

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1          MR. HAUSKEN:  I believe where we had left it is
 2    we were going to discuss it after the other motions,
 3    which you've just heard and have ruled on largely.  So
 4    it's -- I guess it comes down to just what the Court's
 5    ruling will be.  The problem that --
 6          THE COURT:  Did you all have any homework
 7    assignments since our last conversation?
 8          MR. HAUSKEN:  We have -- we have not, Your Honor.
 9          THE COURT:  Hmm, okay.
10          MR. HAUSKEN:  And I think partly the -- Your
11    Honor, I think that there is just a major rift between
12    the parties as to how to handle this, and I think to
13    some degree a large understanding perhaps as well.  One
14    of the problems is that -- so our -- we have asked
15    obviously, as we have discussed before, for enlargement
16    of time for discovery through I think it's April --
17          THE COURT:  For all fact discovery?
18          MR. HAUSKEN:  For fact discovery.  Now, of that,
19    if you look at the first paragraph of our motion, we
20    actually anticipate that -- like, our answers to
21    interrogatories and everything would be updated by
22    mid -- I think it's the 19th of December, and then -- so
23    we're anticipating that there would be some period of
24    discovery after that to conduct -- you know,
25    specifically so that both parties can conduct
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1   depositions and other forms of discovery.
 2           We're -- we're not asking that this be the
 3   end-all of it.  We understand from the Court's order
 4   that required us to essentially go first by trying to
 5   define the use of the invention at the airports, all 80
 6   airports, that there would have to be some, you know,
 7   testing of our numbers afterwards.  And so to logically
 8   do that and -- you know, in a period of time that's
 9   doable, we -- you know, we're suggesting we would
10   produce the -- the -- well, we have the draft proposal
11   that we -- that we provided last -- at the last
12   conference, which is the one that had the "For
13   Discussion Purposes" on the top.  That one -- you know,
14   we would provide those answers, and then after that, the
15   Plaintiffs would have an opportunity to test that.
16           THE COURT:  Well, let's think about that.  You
17   saw what Mr. Graveline filed last night, I assume.
18           MR. HAUSKEN:  No, I -- I have seen it.  I,
19   frankly, other than a cursory --
20           THE COURT:  Well, I can tell you what it says in
21   substance.
22           MR. HAUSKEN:  -- overview, I --
23           THE COURT:  In effect, allowing the Government to
24   have this additional time to answer those
25   interrogatories or requests for admission or whatever
```

1    else is out there, in the face of the Government's
2    general argument that we don't keep this information, is
3    a -- kind of a fool's errand.  In other words, we're
4    wasting time.
5          So I understand that question, and it's a
6    legitimate question, but my bigger concern, frankly, is
7    how the Plaintiff will use whatever you give it by
8    December 19th, and you've alluded to that by saying you
9    anticipate some additional discovery.
10         MR. HAUSKEN:  Um-hum.
11         THE COURT:  If -- if the -- I'm not sure what
12    the -- your answer is going to look like, obviously, but
13    we haven't gained a whole lot if the Government's
14    answers are not -- don't point the Plaintiff in the
15    right direction in order to confirm your answers.
16         In other words, it would -- I assume even you
17    would agree that you wouldn't expect the Plaintiff to
18    simply take at face value that we didn't use your patent
19    at these airports for this period of time.
20         MR. HAUSKEN:  Oddly, yes, we would agree with
21    that, although obviously just a minute ago Mr. Graveline
22    suggested just the opposite with -- in terms of their
23    license -- of their litigation support agreements, that
24    we have to take it at face value what their answer is.
25         But, no, we understand that -- we are -- we are

SecurityPoint Holdings, Inc. v. USA                                    11/1/2017

1    producing information for the purpose of allowing them
2    then to have an idea of what the operation at each
3    individual airport looks like, why we think that some of
4    the -- a portion of the population that travels through
5    that airport should be excluded from the use.
6            THE COURT:  But the "why," that's the critical
7    piece of it.
8            MR. HAUSKEN:  Well, that's all going to be part
9    of it, too.  I mean, we intend to detail, as we showed
10   in the -- in our email, the copy of the proposed
11   response that we offered, the -- you know, we -- we
12   demonstrate there, you know, what we intend to show.
13   We're going to -- you know, things like the numbers of
14   people that go through, you know, why those people
15   are -- should be excluded --
16           THE COURT:  All right.  So the "why" would
17   include we use a different method here?
18           MR. HAUSKEN:  Yeah.  It would be -- for example,
19   the -- well, I think going down the list, we start
20   with -- with the large number.  Out of that should be
21   excluded precheckers --
22           THE COURT:  Well, whatever they are, I'm not
23   worried about the --
24           MR. HAUSKEN:  Yeah, but we have, like, I think
25   about five or six deductions that we are anticipating

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    would be relevant -- maybe more than that, looks like

2    there's actually maybe about ten deductions that could

3    be possible at any given airport.  We would then

4    present, you know, what -- at -- you know, which lanes

5    at that airport were subject to that deduction --

6         THE COURT:  Okay.

7         MR. HAUSKEN:  -- and the number of passengers, to

8    the extent available, that we should -- that we think

9    should be deducted.

10        THE COURT:  Okay.  I can't help but think that

11   would trigger followup questions, as you anticipate, and

12   also depositions, perhaps.  Remind me what we're doing

13   on the 30(b)(6)s.  You were going to furnish names.  Is

14   that right?

15        MR. HAUSKEN:  Yes, we will.  The problem we're

16   running into there is that the people -- we've got 80

17   airports, and to -- to have one person try to answer for

18   all 80 airports would be a fool's errand.  You would

19   get -- you know, we would educate the person based on,

20   you know, some kind of a book of information that we --

21   or the interrogatory answers, and all they would know

22   pretty much is that.  So, you know, we would anticipate

23   that the -- if they want to have meaningful depositions,

24   that it's going to have to be at some much lower level.

25        THE COURT:  Right.  But remind me, the last time

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    we were here, maybe on the phone, we talked about your
2    furnishing names for 30(b)(6)s.
3         MR. HAUSKEN:  We will be, yes.
4         THE COURT:  Does that have a time frame?
5         MR. HAUSKEN:  Ah, I don't think it did.  We
6    anticipated answering that as -- with the
7    interrogatories.
8         THE COURT:  All right.  So you anticipate the
9    depositions would take place after December 19th?
10        MR. HAUSKEN:  Yes, Your Honor.  Yeah,
11   realistically, if we're going to have the depositions
12   occur before then, then there's no point in having the
13   interrogatory.
14        THE COURT:  Fair enough.
15        Are there any other outstanding discovery
16   requests either from the Plaintiff or from the Defendant
17   that we haven't talked about today?
18        MR. HAUSKEN:  Not from the Defendant.  I would
19   rather let Plaintiff answer for himself as to what -- or
20   to itself as to which ones they think are still
21   outstanding, other than -- obviously, the 30(b)(6)s are
22   out there, three depositions of particular witnesses
23   that are -- have been held up.
24        THE COURT:  So April 30, is that what you're
25   proposing?

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1          MR. HAUSKEN:  Excuse me?

2          THE COURT:  That would be for concluding?  So if

3  interrogatories, depositions were noticed, they will all

4  have to be done in such a way that they would be closed

5  out by then?

6          MR. HAUSKEN:  That is correct.

7          THE COURT:  All right.  Let's hear from the

8  Plaintiff.

9          MR. HAUSKEN:  Okay.  Before we do, Your Honor, I

10  would like to comment on this supplemental brief,

11  because it --

12          THE COURT:  Which you haven't read?

13          MR. HAUSKEN:  Which I haven't read.  You know,

14  I -- I think there are two things that I did take away

15  from it just by glancing over it.

16          THE COURT:  Okay.

17          MR. HAUSKEN:  One is it's 32 days late.

18          THE COURT:  Right.

19          MR. HAUSKEN:  And while I don't -- you know, just

20  looking down the table of contents and the table of

21  authorities, it doesn't cite any law applicable to 1498,

22  and this Court obviously has a wealth of law in that

23  area.  So I -- it does not seem to address that.

24          And the third thing I would note -- and I haven't

25  looked at it with any great detail -- but the Exhibit A

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    seems to have been altered from its original state,

2    which is what we -- what we sent Mr. Graveline, and the

3    only way I noted that is, as I mentioned earlier, the --

4    the copy that we provided to Mr. Graveline and to the

5    Court had this "For Discussion Purposes Only" on the

6    top, and the exhibit does not.

7            THE COURT:  Okay, all right.  Thank you.

8            MR. GRAVELINE:  Your Honor, our concern on what

9    counsel has proposed is exactly what you just noted,

10   that by December 19th, which is quite a ways off, what

11   essentially we're going to get is an interrogatory

12   answer that is going to be largely, if not entirely,

13   written by counsel with then no ability to test the

14   information in there.

15           You know, trying to go out and take 80-some

16   depositions I don't think is feasible.  I do think if

17   this is the Government's position that they can educate

18   the 30(b)(6) witness on this topic, and then we can just

19   ask that witness if there's documents, and the witness

20   can say no.  But to wait, you know, several months

21   forward in the case simply so they can conduct

22   interviews, give us a written interrogatory answer that

23   we can't use, I just don't think is going to move the

24   case closer to trial.

25           THE COURT:  Well --

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

SecurityPoint Holdings, Inc. v. USA                     11/1/2017

 1        MR. GRAVELINE:  I mean, with regard to the case

 2    law, I think that case law is directly on point.  Where

 3    a party has not kept records of its infringement, I

 4    think an adverse inference is allowable, and I think

 5    those cases are precisely on point, and I think that's

 6    exactly what happened here.

 7        The Government clearly knew about the patent

 8    many, many years ago.  The case was even filed in 2011,

 9    and the Government apparently has not kept records of

10    its use of the patented methods.

11        THE COURT:  I think I raised that question myself

12    at some point earlier, but I think it's premature in

13    terms of whether or not inferences should be drawn, and

14    I'm -- I'm willing to wait until December 19th, and

15    I'm -- I guess I'm telling the Plaintiff it has to.

16        I take Mr. Hausken at face value in telling me

17    that this is going to be something that will hopefully

18    inform the Plaintiff to a level of detail that makes

19    future depositions and discovery more meaningful.  So I

20    will use those dates, December 19th and April 30th, on

21    the assumption that if there's any subsequent discovery,

22    it will be triggered in advance of that deadline

23    sufficient under the normal rules to conclude it.

24        MR. GRAVELINE:  Your Honor, could we make a

25    request that the Government not be allowed to ask for

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1     any further extensions beyond that?  As I think we noted
2     in our paper, I think we're on extension seven or eight
3     at this point, and obviously the expense to
4     SecurityPoint is significant.  So we would ask for a
5     ruling that if the Government asks for another
6     extension, we be granted our fees.
7              THE COURT:  I'm not going to do that.  I'm
8     sympathetic with it, and I guess I -- I take the view at
9     this point, absent some -- well, I just said I wasn't
10    going to use adjectives -- I didn't want you to use
11    adjectives, so I won't.  And so I won't say what my
12    standard would be for granting an extension of time, but
13    it would have to be well supported.
14             So I'll change the discovery deadline
15    accordingly, and can we get by with my oral rulings on
16    the first motion?
17             MR. GRAVELINE:  We can.  I have just a couple of
18    followup questions on that.
19             THE COURT:  Oh, dear.  Okay.
20             MR. GRAVELINE:  I think they're minor.
21             With regard to SecurityPoint's attorneys' fees,
22    we do believe that is properly an issue in the case, and
23    our request for things like opinions of counsel were if
24    the Government plans to rely on opinions of counsel to
25    establish that its litigation position was substantially

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    justified, I think we are entitled to the document in

2    that case.  If the Government doesn't intend to rely on

3    that, we don't need it.

4         THE COURT:  Right.  It's -- well, all right,

5    let's deal with that.  You can stay right there,

6    Mr. Hausken.

7         MR. HAUSKEN:  Your Honor, I think --

8         THE COURT:  Is there any way to know at this

9    point?  Is there any way to know at this point what the

10   Government's argument is going to be on that issue?

11        MR. HAUSKEN:  I think the law as to attorneys'

12   fees under 1498, which as the Court pointed out is taken

13   directly from the Equal Access to Justice Act, I think

14   that law is very clear.  And I think it's extremely

15   clear that, number one, there is to be no separate issue

16   discussion.  It's the substance of the position as a

17   whole, not divided down into parts.

18        I think it's also clear that it is a decision

19   that -- the substantial justification is to be made by

20   the Court on the record before it, not on discovery, and

21   I think it's very clear that courts -- that parties are

22   not allowed to take discovery on the attorneys' fee

23   issues.

24        In fact, under the -- in the EAJA statute, in the

25   litigation -- in the committee reports that accompanied

SecurityPoint Holdings, Inc. v. USA                          11/1/2017

1      the original EAJA statute, it was made clear that there

2      was not to be discovery on attorneys' fees based on

3      this.  It's to be made on the record.

4              THE COURT:  Well, are you -- well, I'm not sure

5      which point you're addressing.  The -- I believe the one

6      Mr. Graveline referred to was whether or not you are

7      going to be relying, for the substantial justification

8      argument, on in-house attorneys' assessments of the

9      validity of the litigation.

10             MR. HAUSKEN:  And the answer to that is, as I

11     said, I think it's clear that the record -- that the law

12     is that we can't, that right as of today, we are -- the

13     Court has to make -- first, it's the Court that makes

14     the substantial justification determination, but it's to

15     make that based on the record.

16             THE COURT:  Um-hum.

17             MR. HAUSKEN:  So we could argue --

18             THE COURT:  Right.  Well, yeah, that's my view of

19     the world as well.  It's the existing record, that you

20     don't have a separate level of discovery on that

21     subject.  So I hear what Mr. Hausken says, I agree with

22     it, and I'm also assuming that means that if this

23     argument gets raised down the road, I'd be able to cite

24     Mr. Hausken back to himself.

25             MR. GRAVELINE:  Your Honor, if that's what we're

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    going to do, then, if we're going to wait to do that,

 2    I -- I would request that we not produce information

 3    about SecurityPoint's legal fees to date, which is what

 4    the Government has asked for.  So if we're going to

 5    decide this issue later, that's fine, but I think it's

 6    unfair for us to produce information regarding our

 7    attorneys' fees if we are not getting, in exchange,

 8    information from the Government relating to its

 9    substantial justification.

10         THE COURT:  Those are two different things, so

11    let's deal with them separately.

12         All right, you made the comment just a second ago

13    that there shouldn't be discovery about attorneys' fees.

14    Does that apply to the Government as well?

15         MR. HAUSKEN:  No.  There's a very different --

16    our need for their attorneys' fees is a very different

17    reason than their need for how we get to our decisions

18    for substantial justification.  Now, the reason we're

19    asking for attorneys' fees information, as to the dollar

20    value of the fees, is because in order -- they've made

21    two claims.  They have made a reasonable royalty claim

22    and they've made at least one other claim for lost

23    profits.

24         If they're -- and there's I think also one based

25    on some form of financial calculation that we are
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1    totally unclear on and have -- and the Court has -- has

2    said that SecurityPoint does not have to provide us with

3    the 26(a) disclosures at this time for that.  So -- but

4    we -- but there's at least one claim, and that's a lost

5    profits claim, that would -- for which the financial

6    information, including things like how much they're

7    spending for attorneys' fees, are necessary in order to

8    figure profit.  So -- and, you know, to some degree --

9          THE COURT:  I'm sorry.  Are you talking about

10   attorneys' fees related to litigation?

11         MR. HAUSKEN:  For every -- for anything, but what

12   we have to know -- if they are going to play lost

13   profit, we have to know what their -- what their profit

14   is, and the way you calculate profit, among other

15   things, is you have to take the expenses from the --

16   from the income.

17         THE COURT:  Right, but surely you can't put

18   somebody to litigation and then say, well, you -- you

19   can't make any money on this because you're having to

20   spend so much money fighting us.

21         MR. HAUSKEN:  Well, if they want to claim that

22   some part of the attorneys' fees is caused by the

23   litigation and should be -- that there should be some

24   recalculation based on that, that's fine, but until we

25   see what the entire picture is -- see, they have blacked

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

 1   out, like, half -- like whole pages sometimes, and until
 2   we see what, like, the profit and loss is and what
 3   those -- why the -- what expenses there are --
 4           THE COURT:  Hold on a second.  Are you asking for
 5   this litigation, prelitigation as well as
 6   postlitigation?
 7           MR. HAUSKEN:  Well, for any period that they're
 8   claiming lost profits.
 9           THE COURT:  Oh, I see.
10           MR. HAUSKEN:  So -- and we're not asking -- we're
11   not asking for details as to what they're spending the
12   money on.  We're saying, you know, give us the
13   expenses -- you know, it says -- if it says "attorneys'
14   fees," which I wouldn't expect that in their profit and
15   loss statements and expense statements and balance
16   sheets that they would have great detail as to how the
17   attorneys' fees are being spent, but --
18           THE COURT:  See, I assumed that your request was
19   in anticipation of a request down the road under EAJA
20   for attorneys' fees.
21           MR. HAUSKEN:  No, no.  We have to -- we need it
22   right now, at least, for the lost profits.  Now, once
23   we -- once they make the claim, then they have to
24   support it with more detailed information, and we would
25   expect then that we would get to see everything.

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1          THE COURT:  Hmm.  Okay, let's talk about that.

2     If the Government is entitled to challenge the lost

3     profits with "you weren't making any money on this,"

4     right, so to the extent we're talking about the period

5     prelitigation, why wouldn't all expenses, including

6     whatever it takes to --

7          MR. GRAVELINE:  I think that's a different issue,

8     Your Honor, and I think we could provide, you know,

9     costs to obtain a patent, things like that.  I think

10    what counsel is arguing now, though, is that the

11    Government can take the patent, can steal the invention,

12    use the invention, and then try to deduct attorneys'

13    fees that they forced upon us from lost profits, and

14    there's no case law authority about that whatsoever,

15    Your Honor.

16         THE COURT:  Well, does chronologically this thing

17    cleave naturally?  The litigation was filed in '11.

18         MR. GRAVELINE:  Correct.

19         THE COURT:  But was that preceded by a lot of

20    prelitigation activity?

21         MR. GRAVELINE:  I would imagine there would be

22    documents that would show legal fees of getting ready

23    for the case.

24         THE COURT:  Hmm.  So prelitigation, it would be

25    relevant on the question of lost profits.

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1   Postlitigation, to the extent you can differentiate or
 2   anybody can differentiate it, it would be relevant
 3   either to an attorneys' fee request or to lost profits.
 4        MR. GRAVELINE:  I don't believe it would be
 5   relevant at all to lost profits.  I do think it would be
 6   relevant to an attorneys' fees request.  My point is if
 7   Your Honor wishes to put that inquiry until later in the
 8   case, where we would then have an opportunity to get
 9   documents from the Government relating to any
10   substantial justification, we could produce our invoices
11   at that point.
12        THE COURT:  I -- I -- I don't think that that tit
13   for tat necessarily makes any sense.  For the time
14   being -- so when was the patent -- when did it
15   originate?
16        MR. GRAVELINE:  It issued in 2005.
17        THE COURT:  Um-hum.  Well, for the time being, go
18   ahead and furnish what you are proposing to furnish in
19   terms of just raw numbers on attorneys' fees between
20   2005 and 2011, even if that does include some other
21   maybe litigation expense.
22        You were about to tell me something?
23        MR. HAUSKEN:  Yes.  I think that our -- if you
24   look at pages 5 and 6 of our package, this is the kind
25   of example of why we're concerned, is that -- these
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

 1    large blackouts here.  We are assured that some of those
 2    are attorneys' fees.  We don't know what others are, but
 3    you can't make sense -- this happens to be a general
 4    ledger.  You can't make sense of that general ledger
 5    unless you know what the numbers are.
 6          At some point in time, if we're to -- if they are
 7    going to claim lost profits during the litigation, we
 8    have to know what the -- you know, we're not talking
 9    about detailed statements or -- and we've never asked
10    for their attorneys' bills or invoices during --
11    postlitigation.  All we're asking for is the high-level
12    stuff that tells us how much was spent so we can
13    calculate profit and loss.
14          THE COURT:  And what I'm allowing you to get or
15    ordering the Plaintiff to produce is at least through
16    2011, and we can revisit this question.  At some point
17    it becomes relevant to two issues, but I'm just a little
18    concerned that it's going to be impossible to strip out
19    the relevance for lost profits versus litigation
20    expense.
21          MR. HAUSKEN:  Well, in that case, Your Honor, if
22    we're not allowed to get the information to -- in order
23    to defend ourselves against the lost profits claim, then
24    we -- then we -- then they can't pursue the lost
25    profits.

1          THE COURT:  Well, we'll deal with that later.
2     You're welcome -- after you get this information, you're
3     welcome to come back and revisit this question.
4          MR. GRAVELINE:  We have just one more issue, and
5     I think you have had some discussions with counsel about
6     this.  We may not be able to resolve it now, but we are
7     trying to get our experts and our support staff access
8     to SSI, and we have been having trouble doing that.  The
9     Government has taken the position that they need to
10    separately get fingerprinted and register.  I think the
11    rules are clear that that's not the case, that as long
12    as they're working for us, they can get access to the
13    SSI.
14         THE COURT:  What is the SSI?
15         MR. GRAVELINE:  Sensitive security information.
16         THE COURT:  What kind of information are we
17    talking about?  Oh, you're talking about security-
18    clearing information?
19         MR. HAUSKEN:  So the -- there's a separate SSI
20    protective order that specifically says that the --
21    well, I think it's paragraph 5-3 of the order, it says
22    litigation support staff, including paralegals and
23    administrative assistants and expert consultants and
24    witnesses, may not access SSI unless authorized by TSA
25    in writing.

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

1        And TSA's position is that they will not process,

2   in writing, the requests unless they -- unless the

3   people get individually fingerprinted and comply with

4   the other requirements for submission.

5        THE COURT:  Now, does that involve anything

6   beyond fingerprinting?  What does that involve?  Do you

7   have to get a top secret clearance or something?

8        MR. HAUSKEN:  Oh, no, but there is a -- they do a

9   background check and a records check.

10       THE COURT:  Who runs it?

11       MR. HAUSKEN:  TSA.

12       THE COURT:  So it's not going back to the FBI?

13       MR. HAUSKEN:  No.

14       THE COURT:  How long does that take?

15       MR. HAUSKEN:  I think in the case of

16  Mr. Graveline and Ms. Burson, who -- I don't think it

17  took -- I think it took a month or two, maybe, maybe at

18  most.  There was -- there was a hitch there in making

19  sure that the information had been submitted, and then

20  once we got that cleared up, I think they -- it was done

21  relatively quickly.

22       THE COURT:  Well --

23       MR. HAUSKEN:  But the other side of it, Your

24  Honor, is that by regulation and under the protective

25  order, the -- any dispute regarding the approval of

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1    those has to be made in a separate action to the Court
 2    of Appeals directly, under statute.
 3              THE COURT:  Okay.  Well, let's stick with the
 4    current wording of the -- that SSI protective order.  It
 5    doesn't sound like it would be too cumbersome.  To the
 6    extent you want folks to access it, let's go through the
 7    routine we've already spelled out.
 8              MR. GRAVELINE:  Okay.
 9              THE COURT:  Is that it?
10              MR. GRAVELINE:  All right.  Yes, thank you.
11              THE COURT:  No more shoes to drop?  Okay.
12              I will visit the question of the litigation
13    agreements.  For the time being, let's stick with what I
14    said on the record, that I guess I reserve the right to
15    revisit that question.
16              All right.  We're adjourned.
17              (Whereupon, at 11:52 a.m., the proceedings were
18    adjourned.)
19
20
21
22
23
24
25
```

SecurityPoint Holdings, Inc. v. USA                    11/1/2017

```
 1                     CERTIFICATE OF TRANSCRIBER

 2

 3

 4          I, Susanne Bergling, court-approved transcriber,

 5     certify that the foregoing is a correct transcription

 6     from the official digital sound recording of the

 7     proceedings in the above-titled matter.

 8

 9

10

11

12     DATED:  11/02/2017          s/Susanne Bergling

13                                 SUSANNE BERGLING, RMR-CRR-CLR

14

15

16

17

18

19

20

21

22

23

24

25
```